IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| LISA BAIRD | : | No.  4:07-CV-1580 |
| Plaintiff, | : | |
| | : | Judge John E. Jones III |
| v. | : | |
| | : | |
| OUTLOOK POINTE | : | |
| Defendant | : | |

## MEMORANDUM

September 17, 2008

Plaintiff Lisa Baird initiated this action under Title VII of the Civil Rights Act of 1964 and the Pennsylvania Human Relations Act ("PHRA"), alleging that her former employer, defendant Outlook Pointe[1], retaliated against her for engaging in protected activity under these laws.  This matter is before the Court on Outlook Pointe's motion for summary judgment.  (Doc. 16.)  For the reasons set forth below, the motion will be granted.

## I.    STANDARD OF REVIEW

Summary judgment is appropriate if the record establishes "that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  Initially, the moving party bears the

---

[1] The entity named as the defendant, Outlook Pointe of Loyalsock, Inc., is no longer in existence.  The proper defendant is AL Loyalsock Operations, LLC, which is wholly owned by Senior Care, Inc.  (*See* Doc. 13.)

burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The movant meets this burden by pointing to an absence of evidence supporting an essential element as to which the non-moving party will bear the burden of proof at trial. *Id.* at 325. Once the moving party meets its burden, the burden then shifts to the non-moving party to show that there is a genuine issue for trial. Fed. R. Civ. P. 56(e)(2). An issue is "genuine" only if there is a sufficient evidentiary basis for a reasonable jury to find for the non-moving party, and a factual dispute is "material" only if it might affect the outcome of the action under the governing law. *Anderson v. Liberty Lobby, Inc*, 477 U.S. 242, 248-49 (1986).

In opposing summary judgment, the non-moving party "may not rely merely on allegations of denials in its own pleadings; rather, its response must ... set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e)(2). The non-moving party "cannot rely on unsupported allegations, but must go beyond pleadings and provide some evidence that would show that there exists a genuine issue for trial." *Jones v. United Parcel Serv.*, 214 F.3d 402, 407 (3d Cir. 2000). Arguments made in briefs "are not evidence and cannot by themselves create a factual dispute sufficient to defeat a summary judgment motion." *Jersey Cent. Power & Light Co. v. Twp. of Lacey*, 772 F.2d 1103, 1109-10 (3d Cir. 1985).

However, the facts and all reasonable inferences drawn therefrom must be viewed in the light most favorable to the non- moving party. *P.N. v. Clementon Bd. of Educ.*, 442 F.3d 848, 852 (3d Cir. 2006).

Summary judgment should not be granted when there is a disagreement about the facts or the proper inferences that a factfinder could draw from them. *Peterson v. Lehigh Valley Dist. Council*, 676 F.2d 81, 84 (3d Cir. 1982). Still, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; there must be a *genuine* issue of *material* fact to preclude summary judgment." *Anderson*, 477 U.S. at 247-48.

## II.    BACKGROUND

With this standard of review in mind, the following are the undisputed facts material to the present motion, drawing any reasonable inferences in favor of the non-moving party, Baird.

Outlook Pointe was an assisted living facility located in Montoursville, Pennsylvania. (Def.'s Statement of Material Facts ["SMF"], Doc. 18, ¶ 1.) Baird was hired by Outlook Pointe as a part-time position of resident assistant on August 15, 2001. (*Id.* at ¶ 2.) Baird remained a part-time employee throughout her employment with Outlook Pointe, and was never guaranteed a specific number of

hours. (*Id.* at ¶¶ 3-4.) However, Baird often requested and was granted additional hours, and sometimes worked the equivalent of full-time hours. (*Id.* at ¶¶ 4, 6; Pl.'s Resp. to SMF ["Resp."], Doc. 26-2, ¶¶ 3, 4, 6.)

On June 26, 2003, Baird testified at an unemployment compensation hearing for Debra Parr, an African-American former coworker who alleged discrimination based on racial slurs and jokes in the workplace. (SMF ¶ 9; Pl. Ex. 1, Doc. 26-4.) In May 2004, Baird again testified at an EEOC fact-finding conference for a charge filed by Parr. (SMF ¶ 10; Pl. Ex. 2, Doc. 26-5.)

In this action, Baird alleges that Outlook Pointe retaliated against her for testifying on behalf of Parr by reducing her hours, wrongfully disciplining her, and ultimately terminating her employment on May 19, 2006. (Compl., Doc. 1, ¶¶ 12, 17, 20.) Baird also alleges that Outlook Pointe retaliated against her by creating a hostile work environment. (*Id.* at ¶¶ 17, 20.) Baird seeks compensatory and punitive damages. (*Id.* at ¶¶ 18, 21.)

## III.  DISCUSSION

In support of its motion for summary judgment, Outlook Pointe first argues that Baird's claims are, in part, time barred. Outlook Pointe also denies that Baird's hours were reduced and further argues that any employment actions taken with regard to Baird were unconnected to her testimony on behalf of Parr. Finally,

Outlook Pointe argues that, in the event that any of Baird's claims survive summary judgment, her requests for emotional distress damages and punitive damages must be dismissed.   Each of Outlook Pointe's arguments will be addressed in turn.

### A.      Timeliness of Baird's Claims

Title 42 U.S.C. § 2000e-5(e)(1) "specifies with precision" the prerequisites that a plaintiff must satisfy before filing suit under Title VII.  *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 109 (2002) (quoting *Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 47 (1974)).  "An individual must file a charge within the statutory time period and serve notice upon the person against whom the charge is made.  In a State that has an entity with the authority to grant or seek relief with respect to the alleged unlawful practice, an employee who initially files a grievance with that agency must file the charge with the EEOC within 300 days of the employment practice."  *Id.*  Pennsylvania is such a state, and thus Baird was required to file a charge with the EEOC within 300 days of the allegedly unlawful employment practice.

Similarly, under 43 Pa. C.S. § 959(h), to bring suit under the PHRA, a plaintiff must first have filed an administrative complaint with the Pennsylvania Human Rights Commission ("PHRC") within 180 days of the alleged act of

discrimination.  *Woodson v. Scott Paper Co.*, 109 F.3d 913, 925 (3d Cir. 1997).  "If a plaintiff fails to file a timely complaint with the PHRC, then he or she is precluded from judicial remedies under the PHRA.  The Pennsylvania courts have strictly interpreted this requirement, and have repeatedly held that 'persons with claims that are cognizable under the Human Relations Act must avail themselves of the administrative process of the Commission or be barred from the judicial remedies authorized in Section 12(c) of the Act.'"  *Id.* (quoting *Vincent v. Fuller Co.*, 616 A.2d 969, 974 (Pa. 1992)).

In this case, Baird sent a handwritten letter to the EEOC on January 3, 2005 which begins "I am filing a formal complaint against Outlook Pointe of Loyalsock, the administrator Pamela Fenderson, and Outlook Pointe corporate for the retaliation against myself, Lisa Baird, for my continued support/witness in the Debra Parr case with the EEOC."  (Pl. Ex. 9, Doc. 26-12.)

On January 11, 2005, the EEOC responded with a letter requesting Baird complete and return an enclosed questionnaire.  (Pl. Ex. 10, Doc. 26-13.)  Baird completed an Allegations of Employment Discrimination form, a Harassment Questionnaire, a Witness Questionnaire, and a Remedy Information form and returned them to the EEOC on January 22, 2005.  (Pl. Ex. 11, Doc. 26-14.)  The first page of these forms explicitly warned Baird of the 300-day limitations period.

(*Id.* at 2.)  Baird indicated that she had not filed a charge with any other agency concerning these matters.  (*Id.* at 7.)  The EEOC received this paperwork on January 29, 2005.  (*Id.*)  The EEOC acknowledged its receipt of the forms in a February 10, 2005 letter and indicated that it would analyze the information and, if it decide whether to docket a charge, would prepare a draft charge form for Baird's review and approval.  (Pl. Ex. 12, Doc. 26-15.)

By an April 29, 2005 letter, the EEOC sent a draft charge to Baird, which Baird returned with corrections and additional documentation on July 11, 2005. (Pl. Ex. 13, Doc. 26-16.)  A September 22, 2005 letter from the EEOC to Baird states that another copy of the draft charge is enclosed; however, the EEOC file does not contain a copy of the document purportedly enclosed and there is no indication that Baird received a copy.  (Pl. Ex. 14, Doc. 26-17.)  By letter of June 2, 2006, the EEOC sent Baird another copy of the proposed charge.  (Pl. Ex. 15, Doc. 26-18.)  Baird signed the charge on June 23, 2006, and it was received by the EEOC on July 10, 2006.  (Pl. Ex. 16, Doc. 26-19.)  An August 9, 2006 letter from the EEOC to Baird acknowledged receipt of the charge and stated that the EEOC would send a copy of the charge to Outlook Pointe and the PHRC.  (Pl. Ex. 17, Doc. 26-20.)

As an initial matter, the Court will construe Baird's January 3, 2005 letter as the filing of a charge with the EEOC.  Although a formal charge was not signed by Baird until June 23, 2006, the January 3, 2005 letter contained an allegation of discrimination, the name of the charged party, and a request for the agency to take remedial action, and therefore, may be construed as the filing of a charge.  *See* 29 C.F.R. § 1601.12; *Federal Exp. Corp. v. Holowecki*, 128 S. Ct. 1147, 1156-58 (2008); *Bihler v. Singer Co.*, 710 F.2d 96, 99 (3d Cir. 1983); *Grigsby v. Pratt & Whitney Amercon, Inc.*, 2008 WL 2156355, at *4-5 (M.D. Pa. May 21, 2008); *see also Ledbetter v. Goodyear Tire & Rubber Co., Inc.*, 127 S. Ct. 2162, 2166 n.1 (2007) (assuming for the sake of argument that the filing of an EEOC questionnaire, rather than the formal charge, is the appropriate date from which to calculate timeliness of filing under 42 U.S.C. § 2000e-5(e)(1)).  The Court will therefore deem Baird's charge filed with the EEOC as of January 3, 2005.

The substance of Baird's January 3, 2005 letter also suffices to satisfy the PHRA filing requirements.  *See* 16 Pa Code § 42.14(d); *Barra v. Rose Tree Media Sch. Dist.*, 858 A.2d 206, 210-13 (Pa. Commw. Ct. 2004).  Precisely when Baird may be deemed to have filed the charge with the PHRC is less clear.  Under Pennsylvania law, a charge of discrimination that has been forwarded by the EEOC to the PHRC pursuant to the work-sharing agreement between the two agencies has

been deemed to satisfy the filing requirements of the PHRA.  *Woodson*, 109 F.3d at 926 n.12; *Lukus v. Westinghouse Elec. Corp.*, 419 A.2d 431, 452 (Pa. Super. Ct. 1980).  Some courts have held that a charge initially filed with the EEOC is not deemed filed with the PHRC until the date of transmittal of the charge to the PHRC or the date the charge is actually received by the PHRC.  *See, e.g.*, *Zahavi v. PNC Fin. Servs. Group, Inc.*, 2007 WL 3053090, at *4 (W.D. Pa. Oct. 18, 2007); *Lantz v. Hosp. of Univ. of Pa.*, 1996 WL 442795, *3 (E.D. Pa. July 30, 1996); *Barb v. Miles, Inc.*, 861 F. Supp. 356, 361 (W.D. Pa. 1994).  However, other courts have held that the charge is deemed filed under PHRA on the date it was filed with the EEOC.  *See, e.g.*, *Grigsby*, 2008 WL 2156355, at *5; *Shaver v. Corry Hiebert Corp.*, 936 F. Supp. 313, 318 (W.D. Pa. 1996).

Current PHRC operating policy states that a charge initially filed with the EEOC will be deemed filed with the PHRC on the date of its filing with the EEOC if (1) there is a work-sharing agreement in existence between the two agencies, (2) the charge contains sufficient information to meet PHRA filing requirements, and (3) an "Information for Complainant & Election Option to Dual File with the Pennsylvania Human Relations Commission" form, signed by the complainant, is attached to the charge.  PHRC Operating Policy 00-01 (Dec. 18, 2000), *available*

*at* http://sites.state.pa.us/PA_Exec/PHRC/legal/forms/POLICY% 20MANUAL% 20091907.pdf .

In this case, the first two requirements for application of PHRC Operating Policy 00-01 are present.  The record does not reveal whether the requisite dual filing form was signed by Baird and attached to her EEOC charge.  However, at least by the time the proposed charge was prepared, Baird's intent to cross-file the claim with the PHRC was clear.  Under such circumstances, it is likely that the PHRC itself would deem Baird's complaint filed on the same date as her EEOC charge.  Therefore, the Court will hold that Baird's charge was filed for purposes of the PHRA on January 3, 2005.[2]

In addressing whether Baird's charge was filed on time, the Court must identify with care the specific employment practice that is at issue.  *Ledbetter*, 127 S. Ct. at 2167 (citing *Morgan*, 536 U.S. at 110-111).  This is because, for purposes of determining the timeliness of a charge of discrimination, the Supreme Court has "established a bright-line distinction between discrete acts, which are individually

---

[2] Moreover, principles of equitable tolling, applicable under the PHRA, support deeming Baird's charged filed on the date it was submitted to the EEOC given the lengthy delay in the EEOC's processing of the charge and transmittal to the PHRC.  *See, e.g.*, *Gharzouzi v. Nw. Human Servs. of Pa.*, 225 F. Supp. 2d 514, 527 (E.D. Pa. 2002) (collecting cases); *see also Woodson*, 109 F.3d at 926 n.12 (stating "Woodson's case would be quite different if he had marked the box for the EEOC to cross-file and the EEOC had failed to transmit the charge because of a breakdown in the administrative system").

actionable, and acts which are not individually actionable but may be aggregated to make out a hostile work environment claim.  The former must be raised within the applicable limitations period or they will not support a lawsuit.  The latter can occur at any time so long as they are linked in a pattern of actions which continues into the applicable limitations period."  *O'Connor v. City of Newark*, 440 F.3d 125, 127 (3d Cir. 2006) (citing *Morgan*, 536 U.S. at 113).

"The EEOC charging period is triggered when a discrete unlawful practice takes place.  A new violation does not occur, and a new charging period does not commence, upon the occurrence of subsequent nondiscriminatory acts that entail adverse effects resulting from the past discrimination.  But of course, if an employer engages in a series of acts each of which is intentionally discriminatory, then a fresh violation takes place when each act is committed."  *Id.* (citing *Morgan*, 536 U.S. at 113).  "The existence of past acts and the employee's prior knowledge of their occurrence, however, does not bar employees from filing charges about related discrete acts so long as the acts are independently discriminatory and charges addressing those acts are themselves timely filed.  Nor does the statute bar an employee from using the prior acts as background evidence in support of a timely claim."  *Morgan*, 536 U.S. at 113.

The triggering of the charging period for hostile environment claims, which by their very nature involve repeated conduct, is determined differently. *Id.* at 115. "A hostile work environment claim is composed of a series of separate acts that collectively constitute one 'unlawful employment practice.'" *Id.* at 116 (citing 42 U.S.C. § 2000e-5(e)(1)). "The 'unlawful employment practice' therefore cannot be said to occur on any particular day. It occurs over a series of days or perhaps years and, in direct contrast to discrete acts, a single act of harassment may not be actionable on its own." *Id.* at 115. "In order for the charge to be timely, the employee need only file a charge within 180 or 300 days of any act that is part of the hostile work environment." *Id.* at 118. "It does not matter, for purposes of the statute, that some of the component acts of the hostile work environment fall outside the statutory time period. Provided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability." *Id.* at 117.

Supreme Court precedent "provides fairly precise guidance as to what sorts of acts are 'discrete.'" *O'Connor* , 440 F.3d at 127. In *Morgan*, the Court observed that "[d]iscrete acts such as termination, failure to promote, denial of transfer, or refusal to hire are easy to identify," and found that the plaintiff's

12

contentions in that case – that he was wrongfully suspended, charged with a violation of a workplace rule, denied training, and falsely accused of threatening a manager – were discrete acts. *Id.* (citing *Morgan*, 536 U.S. at 114). In *Ledbetter*, the Court held that an employer's allegedly discriminatory evaluations were discrete acts triggering a charging period. *Ledbetter*, 127 S. Ct. at 2167. The Court rejected the plaintiff's argument that subsequently issued paychecks, which were lower as a consequence of the evaluations, and the subsequent denial of a raise based on the evaluations were discrete acts triggering a new charging period because these subsequent events were not separate unlawful employment practices but rather continuing effects of the allegedly discriminatory evaluations. *Id.* at 2167, 2169-70.

In this case, Baird alleges several discrete acts of retaliatory discrimination: reduced hours, wrongful discipline, and termination. Because Baird's charge was not filed with the EEOC until January 3, 2005, she may not recover under Title VII for any of these discrete employment practices that occurred more than 300 days prior to that date, or before March 9, 2004. Similarly, because Baird's charge was not filed with the PHRC until January 3, 2005, she may not recover under the PHRA for any of these discrete acts of alleged retaliation that occurred more than 180 days prior to that date, or before July 7, 2004.

Baird has also asserted a retaliation claim based on an alleged hostile work environment, which she argues is entirely timely.  The Court must reject this argument, however, because Baird has not stated a hostile work environment, but rather impermissibly aggregated discrete acts of alleged discrimination into a separate claim.  The only conduct Baird points to as the basis for her retaliatory hostile work environment claim are the other discrete acts of alleged discrimination:  reduction of her hours, wrongful discipline, and termination.  (*See* Compl. ¶¶ 12, 17, 20.)  At her deposition, Baird was asked to describe everything she alleges made Outlook Pointe a hostile work environment.  (Baird Dep. 44.)  Baird replied only that the reduction in her hours and frivolous write-ups made her work environment hostile.  (*Id.* at 44-45.)  Baird has alleged no basis, other than these discrete acts, for her hostile work environment claim.  Baird may not aggregate these independently actionable discriminatory acts into a single unlawful employment practice and thereby save otherwise untimely claims.  *See Morgan*, 536 U.S. at 110-11, 112, 114; *O'Connor*, 440 F.3d at 127, 128-29 n.6 (noting "there is not a single vote on the [Supreme] Court for the proposition that individually actionable discrete acts may support suit outside the limitations period if they are aggregated and labeled as a hostile environment claim").  Baird has not

stated a retaliation claim based on a hostile work environment, and Outlook Pointe

will be granted summary judgment as to any such asserted cause of action.

### B.    Baird's Retaliation Claims

#### 1.    Governing standards

Title VII provides in relevant part:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees ... because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. § 2000e-3(a).  Similarly, the PHRA makes it an "unlawful

discriminatory practice" for any employer "to discriminate in any manner against

any individual because such individual has opposed any practice forbidden by this

act, or because such individual has made a charge, testified or assisted, in any

manner, in any investigation, proceeding or hearing under this act."  43 Pa. C.S. §

955(d).  A retaliation claim under either Title VII or the PHRA is governed by a

version of the three-part *McDonnell Douglas* framework.  *Marra v. Philadelphia

Housing Auth.*, 497 F.3d 286, 300 (3d Cir. 2007); *Moore v. City of Philadelphia*,

461 F.3d 331, 340-42 (3d Cir. 2006).[3]

---

[3] "[T]he PHRA is to be interpreted as identical to federal anti-discrimination laws except where there is something specifically different in its language requiring that it be treated differently." *Fasold v. Justice*, 409 F.3d 178, 184 n.8 (3d Cir. 2005). Because the PHRA provisions at issue contain no such language, the Court will analyze the plaintiff's Title VII and

The plaintiff must first establish a *prima facie* case of retaliation by tendering evidence that: "(1) she engaged in activity protected by Title VII; (2) the employer took an adverse employment action against her; and (3) there was a causal connection between her participation in the protected activity and the adverse employment action." *Moore*, 461 F.3d at 341 (quoting *Nelson v. Upsala Coll.*, 51 F.3d 383, 386 (3d Cir. 1995)).

With respect to the first prong of a *prima facie* case, "the anti-retaliation provision of Title VII protects those who participate in certain Title VII proceedings (the 'participation clause') and those who oppose discrimination made unlawful by Title VII (the 'opposition clause')" so long as "the employee ... hold[s] an objectively reasonable belief, in good faith, that the activity they oppose is unlawful under Title VII." *Id.* (citations omitted).

As to the second prong of a *prima facie* case, "a plaintiff claiming retaliation under Title VII must show that a reasonable employee would have found the alleged retaliatory actions 'materially adverse' in that they 'well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Id.* at 342 (quoting *Burlington N. & Santa Fe Ry. Co. v. White*,

---

PHRA claims under the same standards and caselaw.

548 U.S. 53, 68 (2006)).  Whether an action is materially adverse "depends upon

the circumstances of the particular case, and should be judged from the perspective

of a reasonable person in the plaintiff's position, considering all the

circumstances."  *Burlington Northern*, 548 U.S. at 71 (quoting *Oncale v.*

*Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998)).  "In evaluating whether

actions are materially adverse, we must remain mindful that 'it is important to

separate significant from trivial harms' because '[a]n employee's decision to report

discriminatory behavior cannot immunize that employee from those petty slights or

minor annoyances that often take place at work and that all employees

experience.'"  *Moore*, 461 F.3d at 346 (quoting *Burlington Northern*, 548 U.S. at

69).

        As to the third prong of a *prima facie* case, "a plaintiff must show a causal

connection between the plaintiff's opposition to, or participation in proceedings

against, unlawful discrimination and an action that might have dissuaded a

reasonable worker from making or supporting a charge of discrimination."  *Id.* at

341-42.  "Many may suffer harassment at work, but if the reason for that

harassment is one that is not proscribed by Title VII, it follows that Title VII

provides no relief.  This third element identifies what harassment, if any, a

reasonable jury could link to a retaliatory animus.  The ultimate question in any

retaliation case is an intent to retaliate *vel non*." *Id.* at 342 (quoting *Jensen v. Potter*, 435 F.3d 444, 449-50 (3d Cir. 2006) (internal punctuation omitted).  Third Circuit case law "has focused on two main factors in finding the causal link necessary for retaliation:  timing and evidence of ongoing antagonism." *Abramson v. William Paterson Coll.*, 260 F.3d 265, 288 (3d Cir. 2001) (citing *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 281 (3d Cir. 2000) and *Woodson*, 109 F.3d at 920-21).  However, a plaintiff may rely on a "broad array" of evidence in establishing the requisite casual link.  *Farrell*, 206 F.3d at 283-84.

"In certain narrow circumstances, an 'unusually suggestive' proximity in time between the protected activity and the adverse action may be sufficient, on its own, to establish the requisite causal connection.  Conversely, however, the mere passage of time is not legally conclusive proof against retaliation." *Marra*, 497 F.3d at 302.  Although an analysis of temporal proximity necessarily depends on the context of each case, it is clear that the protected activity and alleged retaliation must be extremely close in time for such proximity to raise an inference of discrimination on its own.  For example, the Third Circuit has held that two days between a protected activity and an adverse action is "unusually suggestive" of retaliatory motive, *Jalil v. Avdel Corp.*, 873 F.2d 701, 708 (3d Cir. 1989), but that three months is not, *LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n*, 503 F.3d 217,

233 (3d Cir. 2007).  "Where the time between the protected activity and adverse action is not so close as to be unusually suggestive of a causal connection standing alone, courts may look to the intervening period for demonstrative proof, such as actual antagonistic conduct or animus against the employee or other types of circumstantial evidence, such as inconsistent reasons given by the employer for terminating the employee or the employer's treatment of other employees, that give rise to an inference of causation when considered as a whole."  *Marra*, 497 F.3d at 302.

The determinations at the second and third steps of the *prima facie* test are based on the totality of the circumstances.  *Moore*, 461 F.3d at 346 (quoting *Jensen*, 435 F.3d at 452).  "[T]he significance of any given act of retaliation will often depend upon the particular circumstances.  Context matters."  *Burlington Northern*, 548 U.S. at 69.  "[A] discrimination analysis must concentrate not on individual incidents, but on the overall scenario."  *Moore*, 461 F.3d at 346 (quoting *Andrews v. City of Philadelphia*, 895 F.2d 1469, 1484 (3d Cir. 1990)).

If the employee establishes a prima facie case of retaliation, "'the burden shifts to the employer to advance a legitimate, non-retaliatory reason' for its conduct and, if it does so, 'the plaintiff must be able to convince the factfinder both that the employer's proffered explanation was false, and that retaliation was the

19

real reason for the adverse employment action.'"[4] *Id.* at 342 (quoting *Krouse v. Am. Sterilizer Co.*, 126 F.3d 494, 500-01 (3d Cir. 1997)).  "To survive a motion for summary judgment in the employer's favor, a plaintiff must produce some evidence from which a jury could reasonably reach these conclusions."  *Id.* (citing *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994)).  "The plaintiff must prove that retaliatory animus played a role in the employer's decisionmaking process and that it had a determinative effect on the outcome of that process."  *Krouse*, 126 F.3d at 501.

In this case, Outlook Pointe concedes, at least for purposes of the present motion, that Baird's testimony on behalf of Parr at the unemployment and EEOC hearings is protected activity (*see* Doc. 19 at 5), and it is clear that Baird's participation in these proceedings and undisputed good faith belief in the unlawfulness of the underlying discrimination establish the first prong of a *prima facie* case of retaliation.  *See Moore*, 461 F.3d at 341.

Outlook Pointe contends, however, that Baird has failed to establish the other elements of a *prima facie* case, and has offered legitimate, nondiscriminatory

---

[4] The Third Circuit has recognized that the analysis of causation at the *prima facie* stage and the analysis of pretext at the third stage of the *McDonnell Douglas* framework often overlap to a large extent.  *See, e.g.*, *Marra*, 497 F.3d at 301 n.13; *Moore*, 461 F.3d at 345-46; *Farrell*, 206 F.3d at 286 & n.11.  Where applicable, the Court will address these parts of the test together.

reasons for its employment actions.  Each of Baird's claims of retaliation, based on reduced hours, wrongful discipline, and termination, is discussed below.

### 2.    Reduced hours

Outlook Pointe contends that no materially adverse action occurred with respect to Baird's hours and further argues that Baird has failed to demonstrate any causal link between her protected activity and an alleged reduction in her hours. The Court agrees that Baird has failed to establish a *prima facie* case with regard to the alleged reduction in her hours.

Because Baird's claims focus on her hours, set forth below are the hours Baird worked during each two-week pay period (*see* SMF ¶ 8) during her employment with Outlook Pointe.  These hours are derived from the pay stubs provided by Baird (Pl. Ex. 3, Doc. 26-6) and include regular and overtime hours. Paid time off requested by and granted to Baird is noted in parentheses:

| Pay Period Ending | Hours |
| --- | --- |
| 8/18/01 | 33.5 |
| 9/1/01 | 26.5 |
| 9/15/01 | 30 |
| 9/29/01 | 15 |
| 10/13/01 | 16 |
| 10/27/01 | 26.5 |
| 11/10/01 | 7.5 (7) |

21

| Pay Period Ending | Hours |
|---|---|
| 11/24/01 | 7.5 (5) |
| 12/8/01 | 14.75 |
| 12/22/01 | 15 |
| 1/15/02 | 15 |
| 1/19/02 | 15 |
| 2/2/02 | 14.75 |
| 2/16/02 | 15 |
| 3/2/02 | 15 |
| 3/16/02 | 15 |
| 3/30/02 | 15 |
| 4/13/02 | 15 |
| 4/27/02 | 0 (6.5) |
| 5/11/02 | 15 |
| 5/25/02 | 28.75 |
| 6/8/02 | 49.75 |
| 6/22/02 | 45 |
| 7/6/02 | 60 |
| 7/20/02 | 34.5 |
| 8/3/02 | 62 |
| 8/17/02 | 54 (15) |
| 8/31/02 | 15 |
| 9/14/02 | 14 |
| 9/28/02 | 15 |
| 10/12/02 | 15 |
| 10/26/02 | 15 |

| Pay Period Ending | Hours |
|---|---|
| 11/9/02 | 15 |
| 11/23/02 | 7.5 (8) |
| 12/7/02 | 7.5 (7.5) |
| 12/21/02 | 15 (6.5) |
| 1/4/03 | 61.5 |
| 1/18/03 | 57.5 |
| 2/1/03 | 58.5 |
| 2/15/03 | 90 |
| 3/1/03 | 87 |
| 3/15/03 | 80 |
| 3/29/03 | 92.5 |
| 4/12/03 | 102.5 |
| 4/26/03 | 51 (32) |
| 5/10/03 | 99 |
| 5/24/03 | 85.5 |
| 6/7/03 | 93 |
| 6/21/03 | 92.5 |
| 6/23/03 Testimony at unemployment hearing | |
| 7/5/03 | 27 (28) |
| 7/19/03 | 16 |
| 8/2/03 | 16.5 |
| 8/16/03 | 15 |
| 8/30/03 | 15 |
| 9/13/03 | 15 |
| 9/27/03 | 19 |

| Pay Period Ending | Hours |
|---|---|
| 10/11/03 | 19.75 |
| 10/25/03 | 15 |
| 11/8/03 | 15 |
| 11/22/03 | 15 |
| 12/6/03 | 15 |
| 12/20/03 | 7.5 (8) |
| 1/3/04 | 17 |
| 1/17/04 | 15 |
| 1/31/04 | 16.5 |
| 2/14/04 | 22.75 |
| 2/28/04 | 18 |
| 3/13/04 | 30 |
| 3/27/04 | 22.5 (8) |
| 4/10/04 | 37.5 |
| 4/24/04 | 35 |
| 5/8/04 | 30 |
| 5/22/04 | 37.5 |
| 5/04 Testimony at EEOC fact-finding | |
| 6/5/04 | 36.75 |
| 6/19/04 | 36.75 (8) |
| 7/3/04 | 76 |
| 7/17/04 | 50.25 |
| 7/31/04 | 45 |
| 8/14/04 | 27.5 (7.5) |
| 8/28/04 | 31 |

| Pay Period Ending | Hours |
|---|---|
| 9/11/04 | 28 (7.5) |
| 9/25/04 | 30 |
| 10/9/04 | 36 |
| 10/23/04 | 23.5 (7.5) |
| 11/6/04 | 14.5 (15) |
| 11/20/04 | 30 |
| 12/4/04 | 45.5 |
| 12/18/04 | 50 |
| 1/1/05 | 22.5 (8) |
| 1/15/05 | 56 |
| 1/29/05 | 45.75 |
| 2/12/05 | 50.25 (5) |
| 2/26/05 | 51.25 |
| 3/12/05 | 57.25 (14) |
| 3/26/05 | 34 (26) |
| 4/9/05 | 49 (12.5) |
| 4/23/05 | 53.25 |
| 5/7/05 | 52.75 (8) |
| 5/21/05 | 41.5 (1) |
| 6/4/05 | (40.52) |
| 6/18/05 | 63 |
| 7/2/05 | 69.25 |
| 7/16/05 | 65.75 |
| 7/30/05 | 40 (21.51) |
| 8/13/05 | 42.75 (5.92) |

| Pay Period Ending | Hours |
| --- | --- |
| 8/27/05 | 64.25 |
| 9/10/05 | 66.25 (8) |
| 9/24/05 | 66 (8) |
| 10/8/05 | 65.25 |
| 10/22/05 | 58.75 (4) |
| 11/5/05 | 60.75 |
| 11/19/05 | 61.75 |
| 12/3/05 | 61.25 (4.75) |
| 12/17/05 | 38.25 |
| 12/31/05 | 54.25 (8) |
| 1/14/06 | 65.75 (5.25) |
| 1/28/06 | 72.5 |
| 2/11/06 | 63 (4) |
| 2/25/06 | 77.25 |
| 3/11/06 | 78.5 |
| 3/25/06 | 91.75 |
| 4/8/06 | 66.25 (8) |
| 4/22/06 | 21.75 (44) |
| 5/6/06 | 7.5 (31) |
| 5/20/06 | 7.5 |

Outlook Pointe contends, and the Court agrees, that Baird has failed to demonstrate a materially adverse reduction in hours as required by the second prong of the *prima facie* test.  As discussed above, only alleged reductions in Baird's hours occurring after March 9, 2004 may form the basis for her Title VII

26

claim and only alleged reductions in her hours occurring after July 7, 2004 may form the basis for her PHRA claim.  After these dates, however, Baird cannot show a reduction in hours that would dissuade a reasonable worker from making or supporting a charge of discrimination.

Baird's hours varied significantly throughout her employment at Outlook Pointe from a low of 6.5 to a high of 102.5.[5]  However, her hours appear to have fallen into several fairly distinct segments.  From the middle of August 2001 to the middle of September 2001, Baird averaged 30 hours per pay period.  From the end of September 2001 to the beginning of May 2002, Baird averaged about 15.5 hours per pay period.  From the end of May 2002 to the middle of August 2002, Baird averaged about 50 hours per pay period.  From the end of August 2002 to December 2002, Baird averaged about 15.5 hours per pay period again.  From January 2003 to the middle of July 2003, Baird averaged 81.25 hours per pay period.  From July 2003 to February 2004, Baird averaged about 16.5 hours per pay period.  While any claims based on reductions in her hours over these periods are untimely, these facts may be used as background evidence in support of Baird's timely claims.  *Morgan*, 536 U.S. at 113.

---

[5] For purposes of comparison, the paid time off Baird requested and was granted in any pay period is included as part of the hours worked during that pay period.

Baird's timely claims begin in March 2004.  Excluding her final, incomplete pay period, the fewest hours Baird worked after March 9, 2004 was 29.5 hours in a pay period, and that was the only pay period in which she worked less than 30 hours.  After March 9, 2004, Baird worked as many as 91.75 hours in a pay period, and in 38 of 57 pay periods after that date, Baird worked over 40 hours.  Baird's hours increased throughout the relevant time period, and were then maintained at a consistently high level.  Only twice after December 2004 did she work less than 40 hours in a pay period.  On average, after March 9, 2004, Baird worked almost 53 hours per pay period.

Baird argues that the "proper analysis" is compare the hours she worked before and after the June 26, 2003 unemployment compensation hearing (Doc. at 11), but concedes that only reductions in her hours after March 9, 2004 may form the basis for her claim (*Id.* at 10-11).  Even when compared to her hours prior to June 2003, however, Baird suffered no materially adverse reduction in her hours after March 9, 2004.  After March 9, 2004, Baird worked on average more hours than she had at any time during her employment at Outlook Pointe, except for the relatively short period of unusually high hours from January to June 2003.  Baird's hours fluctuated greatly, both before and after her protected activity, as could be expected for a part-time employee with no guaranteed hours and no set schedule.

28

These variations in hours are not enough to establish material adversity when, after March 9, 2004, Baird's hours actually increased and were then maintained at a level consistently higher than most of her prior tenure at Outlook Pointe.

This conclusion is further buttressed by Baird's own actions and admissions. Although the applicable standard is an objective one, *Burlington Northern*, 548 U.S. at 68, it is certainly relevant and telling that any alleged adverse action which occurred after Parr's June 2003 unemployment hearing did not dissuade Baird from testifying again on Parr's behalf at her May 2004 EEOC hearing. *See, e.g.*, *Sykes v. Pa. State Police*, 2007 WL 141064, at *6-7 (W.D. Pa. Jan. 17, 2007), *aff'd* 2008 WL 901969 (3d Cir. Apr. 4, 2008) (holding that employee did not allege materially adverse employment action because she continued to engage in protected activity after alleged retaliation). Moreover, in her deposition, Baird conceded that her hours did not decrease after her testimony at Parr's May 2004 EEOC fact-finding conference, essentially admitting that she suffered no materially adverse employment action within the relevant time period. (Baird Dep. at 76.)

In sum, Baird has not produced sufficient evidence to demonstrate that she suffered a materially adverse employment action in terms of her hours after March 9, 2004, and therefore has failed to establish the second prong of a *prima facie* case for her claims regarding allegedly reduced hours.

Outlook Pointe also contends that, even assuming any reduction in her hours after March 9, 2004 was a materially adverse employment action, Baird has not established a casual link between her allegedly reduced hours and her protected activity as required by the third prong of the *prima facie* test.  Again, the Court agrees that Baird has failed to establish this element of her *prima facie* case.

Baird cannot rely on temporal proximity to establish a casual connection in this case.  Any reduction in hours subsequent March 9, 2004 occurred long after her testimony at Parr's unemployment hearing, and Baird has admitted that her testimony at Parr's EEOC hearing in May 2004 had no effect on her hours.  The Court must therefore look to the other evidence offered by Baird and determine whether this evidence raises an inference of causation.

Baird, however, points to nothing more than the timing of the alleged reductions themselves to establish the requisite casual link, and the Court's own review of the record reveals little else to support her claim.  While Baird did work fewer hours in the pay periods immediately after the June 26, 2003 unemployment hearing, as compared to the pay periods immediately preceding the hearing, her hours were reduced only to levels she had previously worked.  Moreover, any casual chain created by this reduction in hours is broken by the fact that the reduction was temporary.  As discussed above, by March 9, 2004 – the date after

30

which Baird's claim becomes timely – her hours had already significantly increased.  Baird's hours would continue to increase and then remain at consistently high levels throughout the remainder of her employment, including the time surrounding her testimony at Parr's EEOC hearing.

The only other record evidence Baird points to in support of her claim regarding her hours is the affidavit[6] of Sharon Ladson, Outlook Pointe's health promotions coordinator and, for a time, Baird's immediate supervisor, which contains the following statements:

> After Pamela Libby became regional director on several occasions she referred to Lisa as a trouble maker "I want rid of her" told me to cut her hours several times "maybe she will quit!" ... Pamela Libby also mentioned about past EEOC case that she did everything corporate told her to do.  She stated everything they told me to say I did.  And we still lost to "that black girl."  Lisa did give information concerning past EEOC case which caused Pamela Libby to want to get rid of Lisa anyway she could.[7]

(Doc. 29 at 5 [all as in original].)  These broken phrases, however, do not connect a materially adverse reduction in Baird's hours and Baird's protected activity.  As an

---

[6] Baird initially submitted an unsigned, undated, and unsworn handwritten statement without indication of its author, merely labeled as "Exhibit 18 - Handwritten Statement."  (Doc. 26-21.)  Later Baird submitted a notarized affidavit from Ladson adopting the statement has hers. (Doc. 29.)

[7] The Court may consider these hearsay statements on this summary judgment motion because at trial Baird could produce Libby to testify as to her statements.  *See, e.g.*, *Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co., Inc.*, 998 F.2d 1224, 1234 n.9 (3d Cir. 1993); *J.F. Feeser, Inc. v. Serv-A-Portion, Inc.*, 909 F.2d 1524, 1542 (3d Cir. 1990).

initial matter, Ladson did not begin working at Outlook Pointe until 2004. (*Id.* at

1, ¶ 1.)  Therefore, Ladson has no basis to testify as to what occurred before 2004,

the only time period in which Baird actually alleges that her hours were reduced in

retaliation for her protected activity.  Next, even if Ladson's statement permits an

inference that Libby wanted to cut Baird's hours after 2004, this inference is belied

by the fact that Baird's hours actually increased and were consistently high

throughout 2004, 2005, and 2006.  Ladson's statements may also permit an

inference that Libby was upset about the outcome of Parr's EEOC proceeding.  But

other than Ladson's wholly conclusory and otherwise unsupported allegation,

nothing in her affidavit or elsewhere in the record establishes that Libby wanted to,

and in fact did, reduce Baird's hours *because* of her testimony at Parr proceeding.

This allegation does not meet Baird's burden on summary judgment.  *See Lujan v.*

*National Wildlife Fed'n*, 497 U.S. 871, 888 (1990) ("The object of [Rule 56(e)] is

not to replace conclusory allegations of the complaint ... with conclusory

allegations of an affidavit"); *see also Lacy v. Nat'l R.R. Passenger Corp.*, 254 Fed.

Appx. 934, 937 (3d Cir. 2007); *West v. Hudson County Corr. Ctr.*, 231 Fed. Appx.

136, 137 (3d Cir. 2007); *Fletcher v. Lucent Tech. Inc.*, 207 Fed. Appx. 135, 137

(3d Cir. 2006); *Johnson v. Diamond State Port Corp.*, 50 Fed. Appx. 554, 557 (3d

Cir. 2002).

Related to Baird's failure to demonstrate that her protected activity caused a reduction in her hours is her failure to demonstrate that Outlook Pointe's asserted legitimate, nondiscriminatory reason for any reduced hours is pretext.  Outlook Pointe emphasizes that Baird was a part-time employee who was never guaranteed a set number of hours and explains that any reduction in Baird's hours was part of the considerable fluctuation in her hours seen throughout her employment, both before and after her protected activity.  The record supports Outlook Pointe's position.  As shown above, Baird's hours varied significantly throughout her employment, and Baird has proffered no evidence to support an inference that any temporary downward variations in her hours were the result of retaliation rather than the normal fluctuations of a part-time employee's hours.

Because Baird has failed to establish a *prima facie* case of retaliation in terms of her hours, and further has failed to offer sufficient evidence to discredit Outlook Pointe's legitimate, nondiscriminatory explanation for variations in her hours, Outlook Pointe will be granted summary judgment on this claim.

### 3.    Discipline

Baird also alleges that Outlook Pointe retaliated against her by issuing unwarranted discipline.  Again, however, Baird has failed to establish a casual connection between the corrective actions she was issued and her protected

33

activity, and has failed to produce evidence showing that retaliatory animus, rather than the legitimate, nondiscriminatory reasons offered by Outlook Pointe, were the cause of her discipline.[8]

Baird received her first corrective action in April 2003 before, any protected activity took place, for giving a resident two tabs of medication instead of the prescribed one tab.  Baird did not receive another corrective action until June 2005, two years after Parr's unemployment hearing and more than one year after her EEOC hearing, and thus there is no "unusually suggestive" temporal proximity upon which to base the requisite causal link.

Baird received her second corrective action in June 2005 for yelling at another staff member in front of residents and their families in the facility's dining area at meal time.  Baird argues that this discipline was unwarranted because she was yelling to another staff member rather than at him, but this excuse provides no reason to disbelieve Outlook Pointe's explanation that she was disciplined for yelling in front of residents and their families.

Baird received her third corrective action in July 2005 for providing solid food to a resident whom a doctor had ordered receive only pureed food, for

---

[8] Outlook Pointe essentially concedes that the corrective actions issued against Baird constitute materially adverse employment actions.  (*See* Doc. 19 at 5-6, 12.)

changing or discontinuing medications without supervisor permission, and for leaving blanks in the medical administrative record ("MAR").  (SMF ¶ 45; Baird Dep. 106-10, Ex. 25.)  In regard to the food issue, Baird explains that she provided solid food because the resident demanded "real food" and would not eat anything else.  (Resp. ¶ 46; Pl. Ex. 6, Doc. 26-9.)  In the employee comments section of the corrective action form, Baird wrote "these are things that have previously been done and I was not aware of anything changing."  (Baird Dep. Ex. 25.)  At her deposition, Baird explained that this comment refers to staff members previously granting resident's requests for things.  (Baird Dep. 106-10.)  However, Baird also admitted that staff had not previously granted resident requests when doing so violated doctor's orders.  (Baird Dep. 108-10.)  This was clearly the substance of the corrective action; Baird was not disciplined for granting a resident's request for certain food, but for contravening a doctor's orders.  As to changing a resident's medication, Baird apparently chalks this mistake up to an unclear doctor's order. Baird submitted a rather unclear photocopy of this purportedly unclear order, but makes no effort to explain how the order is unclear or why its lack of clarity prevented her from consulting a supervisor prior to making changes to a resident's medication.

As to leaving blanks in the MARs, Baird submits the affidavit of Kristy Hritzko.  (Doc. 26-26.)  Hritzko was employed by Outlook Pointe as a resident assistant from October 2000 to March 2004, and worked thereafter one to two days per two-week pay period on an "as needed" basis.  (*Id.* at ¶ 1; Doc. 33, Ex. A.)  Hritzko states that on occasion, she forgot to sign MARs and supervisors would leave her notes to correct the error or call her in to sign the book, but that she was not disciplined.  (Hritzko Aff. ¶¶ 3, 8.)  Baird contends the fact that Hritzko was not disciplined for substantially similar conduct that was included in her corrective action is evidence that her discipline was unwarranted and pretextual.  As an initial matter, Baird never alleges that she was not also provided opportunities to informally correct her mistakes.  In fact, Baird suggested the opposite at her deposition when she expressed surprise at having received only two corrective actions by June 2005 because she had been told about other problems "a million times."  (Baird Dep. 104-05.)  Moreover, the fact that Hritzko was not disciplined for MAR errors does not mean such errors are not worthy of discipline.  Baird does not deny making the errors or that such errors in fact warrant corrective action.  Most importantly, however, the fact that Hritzko was not disciplined at best raises a possible inference that Baird's similar errors were not the reason for her corrective actions, but it does not support the allegation that her protected activity

36

was real reason for her discipline. *See Moore*, 461 F.3d at 341-42 (stating "a

plaintiff must show a causal connection between the plaintiff's opposition to, or

participation in proceedings against, unlawful discrimination and an action that

might have dissuaded a reasonable worker from making or supporting a charge of

discrimination.... The ultimate question in any retaliation case is an intent to

retaliate *vel non*"); *Id.* at 346 (stating "the plaintiff must be able to convince the

factfinder both that the employer's proffered explanation was false, and that

retaliation was the real reason for the adverse employment action"). Baird must

demonstrate not that Outlook Pointe was wrong to discipline her, but that Outlook

Pointe disciplined her because of her protected activity.[9] *See Kautz v. Met-Pro*

*Corp.*, 412 F.3d 463, 467 (3d Cir. 2005) (stating "pretext is not shown by evidence

that the employer's decision was wrong or mistaken, since the factual dispute at

issue is whether discriminatory animus motivated the employer, not whether the

employer is wise, shrewd, prudent, or competent"). Neither Hritzko's affidavit nor

the other evidence offered by Baird establishes this point.

---

[9] Under the basic Title VII framework, "if the plaintiff has pointed to evidence
sufficiently to discredit the defendant's proffered reasons, to survive summary judgment the
plaintiff need not also come forward with additional evidence of discrimination beyond his or
her *prima facie* case." *Fuentes*, 32 F.3d at 764. In a retaliation case, however, part of the
plaintiff's burden in establishing a *prima facie* case is to show a casual link between her
protected activity and the employer's retaliatory animus. *Moore*, 461 F.3d at 341-42. Even if
the evidence offered by Baird suffices to meet the first burden, it does not meet the latter.

Baird received her fourth corrective action in October 2005 for failing to attend a mandatory CPR and first aid in-service training. Baird explains that she mistakenly believed, based on a phone message left by an intern, that she could test out of the training requirement. Baird also explains that she had informed the kitchen supervisor that she would not be attending the training, although she admits that this administrator was not her supervisor and had nothing to do with the training. (Resp. ¶ 47; Baird Dep. 113-14.) Baird has provided no reason to disbelieve that she was properly disciplined for failing to attend a mandatory training, and Baird herself acknowledged the validity of this corrective action in her annual evaluation. (*See* Doc. 26-25 at 5, ¶ 1.)

Baird received her fifth corrective action in March 2006 for violating company policy and state regulation by signing for medication prior to giving it to two residents.[10] (SMF ¶ 49; Baird Dep. Ex 28.) Baird refused to sign the corrective action form because she "felt as though it was bogus." (SMF ¶ 50; Baird Dep. 118, Ex. 28.) However, Baird provided no comments or response to the corrective action (Baird Dep. 118, Ex. 28) and nowhere in the record before the Court has she attempted explained why this discipline for violation of state

---

[10] *See* 55 Pa. Code § 2600.187(b) (requiring the date and time of medication administration and the name and initials of the staff person administering the medication to be recorded in the medication record at the time the medication is administered).

regulation is "bogus."  Rather than being terminated for what was her third

corrective action regarding medication errors, as permitted under Outlook Pointe's

corrective action policy, Baird was given a second "final" warning.  (SMF ¶¶ 39,

51; Baird Dep. 118-19.)

Baird received her sixth corrective action in May 2006 for violating

company policy and state regulation by failing to sign for medication on four

occasions over two days.[11]  (SMF ¶ 52; Baird Dep. Ex. 29.)  As a result of this

corrective action, Baird was terminated.  (SMF ¶ 53.)  Baird again refused to sign

the corrective action form, but again provided no comments or response.  (Baird

Dep. 120-21, Ex. 29.)  And again, Baird has offered no evidence to demonstrate

that she did not engage in the conduct underlying this corrective action or that

discipline for such conduct was unwarranted.

As evidence of Outlook Pointe's retaliatory animus, Baird points to the

statement from Ladson's affidavit that "I was told to write up Lisa Baird many

times for issues that weren't worthy of being 'wrote up.'"  (Doc. 29 at 5.)  As an

initial matter, Ladson's claim that she was told to discipline Baird "many times" is

belied by the fact that only one of the six corrective actions Baird received was

---

[11] *See* 55 Pa. Code § 2600.187(a)(14) (requiring the medication record to include the name and initials of the staff person administering the medication).

issued by Ladson.  Moreover, like so many of the statements from her affidavit, Ladson's allegation is generalized, conclusory, and unsupported by any facts. Ladson does not state who told her to discipline Baird, what corrective actions Baird received that were not worthy of being written up, or, most importantly, how any purportedly unwarranted discipline was connected to Baird's protected activity.  The  conclusory allegations of Ladson's affidavit do not meet Baird's burden in opposing summary judgment.

In sum, Baird has offered no evidence linking the discipline she received with her protected activity, and has produced no evidence from which a jury could conclude that Outlook Pointe issued these corrective actions for other than legitimate, nondiscriminatory reasons.  Outlook Pointe will therefore be granted summary judgment on Baird's claims.

### 4.    Termination

Finally, Baird also alleges that Outlook Pointe retaliated against her by terminating her employment.  Again, the Court finds that Baird has failed to connect her termination and her protected activity, and has produced insufficient

evidence to disbelieve the legitimate, nondiscriminatory reasons given for her termination.[12]

Baird was terminated on May 19, 2006, long after engaging in any protected activity.  She was terminated in accordance with Outlook Pointe's corrective action policy, which consisted of five steps:  (1) coaching; (2) first warning (written); (3) second/final warning (written); (4) suspension (optional); and (5) dismissal.  (SMF ¶ 39.)  Baird's termination was based on the six corrective actions she received during her employment, and thus to the extent that Baird has failed to make out a *prima facie* case of retaliation based on those corrective actions or to demonstrate that Outlook Pointe's legitimate, nondiscriminatory reasons for this discipline are pretext, Baird's retaliation claim based on her termination similarly does not survive summary judgment.

Baird argues that the reasons for her termination are pretextual because Outlook Pointe failed to follow its corrective action policy.  Baird's contention is based on discrepancies between the corrective action forms and a summary "corrective action log" (Pl. Ex. 4, Doc. 26-7), which contains only four of Baird's six corrective actions.  This argument is entirely spurious as Baird admits that she

---

[12] Outlook Pointe essentially concedes that the corrective actions issued against Baird constitute materially adverse employment actions.  (*See* Doc. 19 at 5-6, 15.)

41

received and reviewed with supervisors each of the corrective actions.  (Baird Dep. 102, 104, 106, 112, 117-19, 120.)  Baird received six total corrective actions and four corrective actions related to medication safety errors.  Thus, her termination was entirely consistent with Outlook Pointe's corrective action policy.

Moreover, Outlook Pointe's corrective action policy also provided that:

> The corrective action level in which you will begin will depend on the nature and severity of the problem and your past performance as determined by [Outlook Pointe].  Additionally, [Outlook Pointe] reserves the right to address serious infractions with discipline, including discharge if necessary.  Steps in the corrective action process may be skipped or repeated depending on the severity of the infraction.

(Baird Dep., Ex. 22.)  Baird's more serious infractions, such as giving twice as much medication to a resident as prescribed or willfully disobeying doctor's orders, easily could have justified greater discipline.  The fact that Outlook Pointe moved incrementally through the corrective action process and provided Baird additional warnings lends support to the legitimate, nondiscriminatory reasons offered for Baird's termination.

Baird has not produced sufficient evidence to support the inference that she was terminated because of her protected activity, and has failed to sufficiently discredit Outlook Pointe's proffered reasons for her termination.  Outlook Pointe will therefore be granted summary judgment.

## IV.   CONCLUSION

The record in this case establishes that Baird was a capable employee who, despite some mistakes, for the most part performed her job well.  The record also reveals that Baird was frustrated with some of her supervisors and co-workers, and frequently voiced concerns about favoritism, nepotism, interpersonal conflicts, a perceived lack of respect, and others' lack of diligence.  Title VII, however, "does not set forth a general civility code for the American workplace," *Burlington Northern*, 548 U.S. at 6, and does not mandate a happy, pleasant, or stress-free work environment.  *Jensen*, 435 F.3d at 451; *Waite v. Blair, Inc.*, 937 F. Supp. 460, 468 (W.D. Pa. 1995).  Title VII prohibits discrimination on the basis of race, gender, ethnicity, or religion and retaliation based on an employee's opposition to such discrimination.  The record does not establish that Outlook Pointe took any adverse action against Baird because she testified at Parr's unemployment and EEOC hearings, and therefore, Baird has no recourse under Title VII.  For the foregoing reasons, Outlook Pointe's motion for summary judgment will be granted.  An appropriate order will issue.